May it please the Court. Just keep your voice up, okay? I will try. I apologize, Your Honor. May it please the Court. Good morning, Your Honors. I am Bonnie Eskenazi of Greenberg Glusker, and I'm representing Atlantique Productions. I'd like to reserve one minute for rebuttal, if I may, please. Your Honors, the question here is whether there's a genuine issue of material fact regarding whether the parties intended to be bound prior to actually getting an ink signature or whether they only intended to be bound when they had an ink signature. Now, there is more than sufficient evidence that raises a genuine issue of material fact, and the evidence, in fact, is compelling. The Court below improperly acted as a trier of fact, failed to draw all inferences in favor of the nonmoving party Atlantique. For example — What was the evidence that would present a triable issue of material fact? Well, first of all, when was the contract formed? Was it the email on July 20? That's exactly right, Your Honor. And that is the primary exchange that we believe constitutes the evidence. But there was a lot of evidence. Number one, there was never once in any contract, draft, or email, never once where the parties said the contract would not be binding until it's signed. The Court relied on the July 19th email in saying that the parties expressly agreed to that. But there was not one single mention that the parties would not be bound until the contract was signed. What the — what that July 19th email said was, final execution of the attached term sheet, which remains subject to various corporate approvals. Corporate approvals are not the same as it's not — it's not final until — So it's subject to various corporate approvals. That's right. Meaning that unless corporate approved it, there would be no binding contract. That's right. And, Your Honor, the testimony was that, number one, Mr. Zand was the person who had authority to speak for the company. Everybody had said that, and it was actually said in the email. Is that the same as the authority to sign? It's authority to deal with the closing of the agreement. And that's what was said. But is that the same? Is that the same as the authority to sign? No, it's not the same as the authority to sign. But what it was was authority to close. There's a difference between corporate approvals and signing. You can convey that there were corporate approvals without saying the only way to express corporate approval is by signing the agreement. And, in fact, here we had various statements in writing and verbally that it was approved to be — to be closed. For example, Mr. Kearney testified that Mr. Zand told him that there would be corporate approvals as they went along, and, in fact, told him there were corporate approvals as they went along. In other words, when there was a dispute about how to resolve it. He said, okay, we're good on that. Let's go. July 19th and — July 19th and 20th were absolutely pivotal. On July 19th, the parties had a couple of outstanding disputed issues, which they resolved on the telephone. Thereafter, Mr. Zand emailed the final version, and he said to Mr. Kearney, in light of last night's call, we're all good. It's all good. All seems in line. Mr. — then he emailed Mr. Bibas, and he said, these are the revisions reflecting the agreement that we reached, and here's the exhibit. And so we're all good now, right? Which is another way of saying we're done, right? It's a reasonable inference that you're saying we're done. And Mr. Bibas took it as, okay, so you're saying we're done. And he said, yes. In fact, we are in agreement. We're done. We're closed. Now, interestingly, Mr. Zand did not say, whoa, whoa, whoa. Whoa, wait a minute. We're not — we're not closed yet. We need signatures first, so don't get ahead of yourself. Instead, he said — Well, what he said was — what he said was, yes, we're all done. Yes, we're good. Yes, we're good to go. We're going to have a great collaborative success. It — it is a reasonable inference from those statements that he got the corporate approvals when you put them together with Mr. Kearney's testimony, which has to be the case. All inferences have to be made in favor of the nonmoving party. What about the trial court's determination that the uncontroverted facts demonstrate that the understanding between the parties in negotiating the agreement was that the term sheet had to be signed by both parties? The court relied on — Was that done? No, Your Honor. The court relied on the July 19th e-mail at page 10, lines 23 through 26. And yet, in that e-mail — now, these were two sophisticated parties. Mr. Zant had been in the — had been a business affairs attorney for years and years. He knew how to say, this is not binding, I shall sign. But they know how to sign their names, too, don't they? They did. I mean, I'm surprised that you'd put a deal like this together and you didn't get both parties to sign the agreement. Well, Your Honor, what they did was in e-mails, and this happens very frequently in these agreements that have been negotiated over time, that they exchanged these e-mails saying, okay, now we're done. Okay, we're good. We're good to go. And let's go. We're going to start making changes and we're going to start demanding that Atlantique ION demanded that Atlantique make changes and give them meaningful consultation so everybody was ready to go as soon as they closed the deal. What the Court was relying on was that July 19th agreement, that July 19th e-mail, which did not say it wouldn't be binding until signed. Now, everybody — Well, it did. I'm looking at it. It says, of course, final execution of the attached term sheet, which remains subject to various corporate approvals. So I'm not sure that in the subsequent negotiations they need to say over and over again. Now, remember, I told you that corporate approvals would still be needed. Well, Your Honor, it's interesting. There are a couple of things. Number one, corporate approvals are different than binding when signed. Corporate approvals can be obtained and communicated in many different ways. One way is to say, okay, guys, we're all good. Let's go. Another way is to say, we're closed. Another way is to say expressly, I now have corporate approvals. It can't be the fact that saying, I now have corporate approvals, is the only way to indicate that you have corporate approvals. It can't be the fact that the only way the parties could indicate that they have reached agreement and have corporate approvals is signing unless somebody says that. That's not the way people deal in business. It is not the ordinary course. You mean if people deal in this field when it comes to their contractual obligations, that they don't reduce the terms to a final contract that both of them sign? No, they do, Your Honor, but not only in this field. It's not only in film production, but in all fields, in contract construction. There are cases, the cases are Legion in California, where the courts have held that the contract, even though the parties anticipated making a written contract, that they intended to be bound prior to that. And part of how you can tell that they intended to be bound is how the parties acted. For example, here's some other evidence. Even Mr. Zand said that the signatures were just paperwork. Now, the difference between – there's a difference between substantively indicating that you have corporate approvals, which is to say we're done, we have corporate approvals. That's the substance. And signatures could be just administrative. Mr. Zand indicated that they were just administrative. Even when he talked about the protocol or the process, a process or a protocol is just administrative. It is not saying – But it was clearly contemplated, though, here. It was more than just administrative here. But one of the reasons that it was clearly contemplated, and believe me, Your Honor, well, you don't have to believe me, but there are many cases, many of which we cited in our brief, where the parties clearly contemplated that a written agreement would be made after – but it wasn't dependent on only signatures closing the contract. And that's Stephan v. Maloof, Columbia Pictures v. DeToff. All of those cases, Nolte v. Southern California Home, all of those cases fully anticipated a written contract that had signatures. In fact, some of those cases involved where there was just one signature, where one party signed and the other didn't. You want to save your minute? I have one – yes, I would. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Michael Zweig for the Appellee Ion Media. Contracts – Why isn't it – let me ask you. So why isn't it significant that on the 20th, the email on the 20th didn't contain the prior admonitions that are subject to corporate approval and signatures? It's not significant because just hours before, a very specific approval and signature protocol had been laid out and never at any time contradicted by anyone on the Atlantic side. So that was the email on the 19th. That's right. So there's an email on the 19th that goes out. It goes out really to everyone. Everyone receives it. On the evening of July 19th, Mark Zand, acting on behalf of Ion, the head of business affairs, has a conversation with Atlantique's principal. Principal, obviously, being Bebas. Bebas is a trained lawyer. Bebas doesn't say to Zand in that conversation, and the deposition testimony would have indicated otherwise if he had, oh, we have a signed protocol here. Let's change it. I don't agree that that should be the protocol prior to coming to an agreement here. Bebas says nothing about that. And we go into the next day, and there are follow-up emails, Your Honor, in which the reference – the same reference to signatures by Zand is made. It is made in the first email Zand sends. I think it's 839 in the morning. On the 20th. Of July 20th, and he indicates to Mr. Carney who he is updating because Mr. Carney is in Los Angeles, Mr. Zand then in New York, and, of course, Bebas is in Paris. So he is, as a matter of courtesy, updating Carney on, I had a conversation with your principal the evening before, just wanted to let you know, I believe we are all good, he says in that email. How do we move this process along to signatures? Why? Because if you have a party who is in Paris, and there's going to be a signature being provided by that party, you'd need to have some means by which Atlantic Signature would be coming back to ION. So it is not significant that every single email on the 20th did not repeat a protocol that had been clearly established on the 19th. Why? Because parties don't act that way. Lawyers don't act that way. Nor should they be required by this court to do so. But by the afternoon of the 20th, it seemed like there was an agreement in principle, reach, or at least the argument is that the party should be allowed to go to trial on the issue whether there was an agreement reached, right? I'm looking at the emails back and forth around 340 from Bebas Oliver to, or Oliver Bebas to Mark Zand saying, this is the last version. And then the response to that is the final version looks fine. Are we good? I just deleted a couple of very minor alterations. Yes. And does that create a tribal issue effect? No, Your Honor. It does not. And in fact, there were references by Appellant's counsel with respect to what inferences can or should be drawn from any of the emails that come on the 20th. Well, let me ask you. And the district court did a pretty good job of indicating why there were no reasonable inferences as to there being a firm agreement as to that point. What caused your client to have cold feet after all of this was going on back and forth, you know? Great question. It was like a beautiful relationship until they had to walk down the aisle. Yes. What happened? I actually think it is, when you look at it in context, and there is a context for this. Well, I'm looking at it in context. We had, we meaning ION, had over the past four or five weeks had considerable trepidation, which it expressed to Atlantique about the deal. These parties had never dealt with each other before. They didn't know each other from Adam. They had no relationship. There was no custom and practice. They didn't know each other's moves. There was a lot of uncertainty. ION expressed to Atlantique, we have real concern. We only have the right to have something called meaningful consultation and what this is going to look like. We don't know what it's going to look like. We don't know if we can trust you. Well, they knew all that right from the beginning. No, no. What they didn't know as it proceeded and into July was that Atlantique.  Is that what you're saying? What became apparent in July, your honor, was that Atlantique basically decided what kind of music should be accompanying the program. And ION had a strong reaction to this Europop music that was being used. In addition, there was a significant issue that arose. What's the difference between Europop music and what we have here? No. It was music that ION believed would not be appealing to its mainstream American audience. And that was part of the issue here. They picked a title without consulting ION. If a party is supposed to be in the future providing meaningful consultation and the track record is, you already ignored us. You already treated us, as their emails internally now suggested, as idiots. That's how Atlantique regarded ION, surreptitiously, internally. If that's the case, how could ION have the trust it needed? So, Atlantique's view was that the ION people were idiots? Atlantique's view internally was there are emails, which we've cited in the record, in which they refer to ION as idiots, as their comments involving music as idiotisms. The distrust that ION increasingly began to feel in July, Your Honor, prior to July 19th and 20th, was very real. They had taken a cast member who we thought, ION thought, was very important, Alex Kingston, familiar to American audiences, and unbeknownst to ION, couldn't cut a deal with her. Didn't tell us until the very last minute. They let it go down to the wire. Those things created great distrust. So, you come to July 19th, into the 20th, and you actually come to a place where the business terms were fundamentally agreed to. But life is just not about business terms, Your Honor. So, just to follow up on Judge Pergerson's question, which is, so on the 23rd, you get the signature from Atlantique. Yes. And ION just suddenly decided on that day or the next day that they weren't going to sign and send it back? Oh, no. No, no, no. There was much more context than that. What happened was that on July 19th, the same day that those pivotal emails are being exchanged, we have a man on the spot. He is actually in Paris, on the set, listening to Jean Reno, the French actor, mispronounce words in English. And he actually calls ION and says, I think we may have a problem here. That dialect issue we were concerned about, that's coming to be real. And he notes that. And then they are sent the dailies on July 20th, and the dailies over that weekend cause even greater consternation. The 20th, the 21st, the 22nd, resulting then in Zan's email of the 25th, which says, look, he makes reference to corporate approvals. There couldn't be a clearer continuity here. On the 25th, Zan says, we have a protocol. You know we're still circulating this, and it hasn't gotten approved yet. But that aside, we have a bigger problem here. We have significant creative issues. So we had the business terms agreed to, but it's kind of like much like when you go to buy a car, and one part of a couple negotiates with the car dealer. But ION is not a novice in this business. No. They know what's going on. They know how things come about, how deals are made. In this case, Your Honor, in this case, the testimony and the record shows that ION only makes deals by signing them. ION only makes, signifies its acceptance of a deal by signing them. And this is not the Hollywood, the typical Hollywood case where ---- Had ION seen dailies before the 20th? No. The first time we were promised dailies, actually early on in July, they said, you'll be getting dailies by mid-July when production starts. We don't get them until the 20th. And we view the dailies, but in combination with the report on the scene that we received back from Paris on July 19th, that's what caused the consternation. There was no deal made here. This is not the type of case where, you know, the movie actor has already appeared in the film before the deal gets signed. This is the case where someone says, I know we have the financial term worked out, but we still have pivotal, important issues of trust. And it was those issues of mutual trust that prevented this deal from moving forward at that point in time. Well, did Atlantic know right from the start that all this would have to be reduced to writing and both sides would have to ---- Both parties knew, and I realize I'm over time slightly. Go ahead, Ant. Both parties absolutely knew that this deal required two signatures. Why? Because from the very start, the first term sheet, there was an indication in the first term sheet that it was not binding without corporate approvals. In the next seven drafts exchanged of the term sheet, seven or eight, every draft contained the language, except in the greed and two signatures beneath. That is unambiguous evidence of the parties' intention and understanding that the way they intended to signify their approval to an agreement here was by affixing their signatures, only confirmed on July 19th when Zan sent his e-mail confirming that the protocol was to be corporate approvals and signature. Well, that was an implicit representation. I think certainly that's fair. That's certainly fair, Your Honor. But I think I understand that we're instructed to be looking at not only the parties' expressed communications, but in addition surrounding circumstances and a very fair inference that can be drawn that when you have an agreement with two signatures and then the parties say, where are the signatures, let's get the signatures, it evidences their mutual understanding and agreement that two signatures were required. I got your point. Okay. Thank you. Thank you, counsel. Thank you, Your Honors. I just want to run through very quickly a couple of important points. Number one, interestingly, with the process or protocol which was administrative, was clearly intended to be administrative because the parties, one was, you know, here in California and Florida and New York and the other was in France, that's different than substance, but interestingly, even with that protocol, which, by the way, was set out on July 20th and was changed from July 19th. July 19th, there was a corporate approval reservation of rights. July 20th, that same protocol left out the corporate approval. And interestingly, when you set out that process or procedures, it was very specific. You signed, then we signed. There was no process specified or indicated that there would, that, you know, we'd get corporate approvals and then we'd sign. Is this the normal way that business is done in this industry? It is the normal way that business is done in this industry, but I think it's the normal way that business is done throughout California. There are many cases in all kinds of industries in which it is very clear that a binding contract can be reached before signatures in very many different places. Well, in those other cases, there's a product that the, say, the buyer or the person, you know, they can see the product. Here, they didn't. They only had some sample. You certainly can see the product, but because ultimately it's a motion picture. You didn't have it right there. But they got, and for example, Ayan has admitted that they did not get the dailies until July 20th because it was very clear and they knew and there was evidence that they wouldn't get the dailies until the deal was closed. Because people in this industry do not give dailies. Like, you and I couldn't just get a daily. That's not what's done. It's only a very closed, confidential disclosure. And so until you're in the circle, you don't get them. That was done on July 20th. Mr. Kearney, for example, sent out e-mails saying, hooray, the deal is closed, we're done. Mr. Ayan said that they complained about the music and the title. That's part of the issue. That stuff was changed. There were discussions about changing all of that stuff. Who has the right to demand a change unless they actually believe that they're in an agreement? For example, if you want to buy a tailor-made suit, do you say, can I see it all done before it's done? I want you to make that change. I want you to change the lapels, et cetera. If you're going to make a custom-made suit, you need to agree to the custom-made suit. Now, you can make changes afterwards, which they did, but even with respect to Alex Kingston, and by the way, Mr. Zand said on July 20th, all of these issues are fixable. That's on July 20th. So it was very clear that Ayan was indicating to Atlantique that all of these issues, the music, the title, all of that stuff was fixable. With respect to Alex Kingston, there are e-mails in the record which say that Ayan agreed that Alex Kingston's replacement was just as good. No problems there. This is just a, you know, sort of litigation made-up issue afterwards. Jean Reneau's accent, that's looping. That happens all the time. You spent over your time. I'm sorry? Over your time. Thank you, Your Honor. Thank you. Thank you. Thank you, counsel. The matter is submitted.
judges: Pregerson, Paez, Nguyen